IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

IN RE:  KEVIN SCOTT O'BRIEN,

                    Debtor.

 ROBERT DWYER,

                    Plaintiff/Appellant,

v.                                                        CIVIL ACTION NO.  5:08-cv-01269
                                                                                     5:08-mc-00058

FIRST NATIONAL BANK, et al.,

                    Defendants/Appellees.


**MEMORANDUM OPINION AND ORDER**

        Before the Court are Defendant/Appellee First National Bank's Motion for Withdrawal of
Reference to the Bankruptcy Court [Docket 1 in 5:08-mc-58] and Plaintiff/Appellant Robert
Dwyer's Motions to Consolidate Civil Actions [Docket 6 in 5:08-mc-58; Docket 7 in 5:08-cv-1269].

*I.  FACTUAL AND PROCEDURAL BACKGROUND*

        This action follows from the check-kiting and fraud scheme of Kevin Scott O'Brien.  With
little business training or agricultural background, O'Brien set about to become a cattle broker.  At
some point during the venture, O'Brien's legitimate business activities were not sufficiently
profitable and he began to engage in various illegal activities to keep his business afloat, including
kiting checks and defrauding banks and investors.  He managed to pull Charles Henthorn and G.
Thomas Garten into the scheme.  Henthorn and Garten were the president and a member of the board

of directors, respectively, for First National Bank (FNB).  O'Brien paid a series of bribes to

Henthorn, ostensibly in order to receive preferential treatment from FNB.  However,  in the related

criminal cases involving O'Brien, Henthorn, and Garten, there was no evidence presented that

O'Brien actually received preferential treatment in any of his transactions with the bank.  Garten

aided Henthorn  in receiving the bribes, but it has not been proven that Garten personally received

any bribes.

Inevitably, O'Brien's cattle-broker variation on the classic Ponzi scheme collapsed.  On

March 29, 2006, O'Brien filed a voluntary petition for bankruptcy.  The bankruptcy proceedings are

ongoing to date.  Following a lengthy criminal investigation, federal criminal charges were filed in

January 2008 against O'Brien, Henthorn, and Garten for their participation in the scheme.  All three

pled guilty to the charges and were sentenced in this Court on October 17, 2008.

Robert Dwyer is a cattleman from Illinois who became a victim of O'Brien's scheme.[1]

According to the allegations in the complaint, O'Brien held a herd of cattle on his farm in West

Virginia pursuant to a consignment agreement.  Under the terms of the agreement, O'Brien was to

offer the cattle for sale and pay the consigners a specific sum of money per head of cattle sold.  In

February 2006, Dwyer entered into a contract with O'Brien for the purchase of approximately eighty

head of cattle.  Dwyer paid O'Brien $104,000 for the cattle at that time.  On March 16, 2006, Dwyer

traveled to O'Brien's farm for the purpose of selecting which cattle to take under the agreement.

Two loads of cattle, consisting of forty animals each, were chosen and segregated into separate pens.

---

[1]  At O'Brien's sentencing hearing in case number 5:08-cr-00024, the Court found Dwyer to be a
victim within the meaning of 18 U.S.C. § 3663A.  O'Brien was ordered to pay Dwyer $344,000
restitution.

O'Brien represented to Dwyer that the cattle would be loaded onto trucks shortly and shipped to Dwyer's farm in Illinois.

Dwyer never received the cattle and the consigners never received their share of purchase price. Instead, O'Brien delivered all of the remaining cattle on his farm to Garten a few days later in accordance with a sales agreement. The eighty head of cattle previously purchased by Dwyer were among the cattle sold to Garten. On March 20, 2006, the proceeds from the sale to Garten were deposited into O'Brien's account with FNB. FNB used the money in O'Brien's accounts, which included the money paid by Garten for the cattle, to setoff against sizeable unsecured debts O'Brien owed to the bank. On March 29, 2006, O'Brien filed for bankruptcy. Dwyer alleges that FNB, Garten, and Henthorn were all knowing participants in the scheme to defraud Dwyer for the benefit of FNB.

On March 15, 2007, Dwyer filed an adversary proceeding (AP) (5:07-ap-05005) against FNB and Trustee H. Lynden Graham, Jr., in O'Brien's bankruptcy case. In his original complaint in the AP, Dwyer argues that he was the beneficial owner of the roughly eighty head of cattle on O'Brien's farm that he had selected and paid for. O'Brien's interest in the cattle, if any, was legal in nature. Therefore, O'Brien held the proceeds of the sale of the cattle in trust for the benefit of Dwyer. Under this theory, Dwyer requests a declaratory judgment that any funds held by FNB traceable to the sale of Dwyer's cattle were owned by Dwyer. Thus, Dwyer's right to the funds takes priority over FNB and the bankruptcy estate. Dwyer seeks to recover the cattle purchase price directly from FNB.

Dwyer filed a motion for summary judgment against FNB and Graham in the AP on January 8, 2008. Shortly thereafter, on March 3, 2008, Dwyer filed a motion to amend the complaint. The

amended complaint adds a second count, which requests a judgment for fraud, civil conspiracy, aiding and abetting a wrongful act, tortious interference with contract, and negligence against FNB, Garten, and Henthorn.[2]  Fearing that the two-year statute of limitations could expire before the bankruptcy court ruled on the motion to amend the complaint, Dwyer filed a civil action against FNB, Garten, and Henthorn in the Circuit Court of Greenbrier County, West Virginia.  The state court action mirrors Count 2 of the amended complaint in the AP but does not include the declaratory judgment claim in Count 1.  On April 1, 2008, the bankruptcy court granted Dwyer's motion to amend the complaint, making Count 2 of the AP and the civil action identical in all material respects.

The bankruptcy court held a hearing on Dwyer's summary judgment motion against FNB on May 6, 2008.  The court declined to rule on the motion at the hearing and took the matter under advisement.  Roughly one week later, on May 15, 2008, FNB filed the instant motion to withdraw the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d).  FNB argues that neither of the claims in Dwyer's amended complaint represent core bankruptcy proceedings.  Accordingly, FNB contends that the Court should exercise its discretion to withdraw the reference and adjudicate Dwyer's claims here.  Garten opposes the motion to withdraw the reference, arguing that the matter should remain with the bankruptcy court, which is familiar with the factual and legal issues presented, until such time as a trial by jury should become necessary.  Neither Dwyer, Henthorn, nor Graham have stated positions on the motion to withdraw the reference.

---

[2]  The two counts of the amended complaint in the AP hereinafter will be referred to as Count 1 and Count 2.

On November 6, 2008, FNB invoked 28 U.S.C. § 1452(a)[3] to remove the civil action pending in the Circuit Court of Greenbrier County to this Court.  On December 1, 2008, Dwyer filed a motion to consolidate the removed action (5:08-cv-1269) with the AP (5:08-mc-58) pursuant to Rule 42 of the Federal Rules of Civil Procedure.  No party has noted its opposition to the motion to consolidate.  The pending motions have been fully briefed and are ripe for the Court's consideration.

## II.  MOTION TO WITHDRAW REFERENCE

### A.      Applicable Law

This Court's local rules provide that "all proceedings arising under Title 11 or arising in or related to a case under Title 11, are referred to the Bankruptcy Court for disposition."  L.R. Civ. P. 83.13 (citing 28 U.S.C. § 157(a)).  The Bankruptcy Court is authorized to enter orders and judgments on all core bankruptcy matters and to submit proposed findings and recommendations to this Court on all non-core matters.  28 U.S.C. § 157(b), (c).  It is within the Court's discretion, however, to withdraw the reference "on its own motion or on timely motion of any party, for cause shown."  *Id*. § 157(d).  This is known as permissive withdrawal.  Withdrawal is mandatory in other contexts not relevant here.  *See* 28 U.S.C. § 157(d) ("The district court shall . . .withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both

---

[3]  This section provides:

> A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a).  Section 1334 confers jurisdiction on district courts to hear claims "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

title 11 and other laws of the United States regulating organizations or activities affecting interstate

commerce.").

"Cause" is not defined in the statute and there is little guidance from the Fourth Circuit as

to the requisite type or degree of cause that must be demonstrated.  A survey of decisions from other

circuits reveals there is substantial agreement that the following six factors are relevant to the

analysis of good cause:

> (1) whether the proceeding is core or non-core; (2) the uniform administration of
> bankruptcy law; (3) promoting judicial economy; (4) the efficient use of the parties'
> resources; (5) the reduction of forum shopping; and (6) the preservation of the right
> to a jury trial.

*Allen v. Nat'l City Mortg. Co.*, 2:04-mc-188, 2006 U.S. Dist. LEXIS 94819, at *4 (S.D. W. Va. July

13, 2006) (Goodwin, J.) (citing *In re US Airways Group, Inc.*, 296 B.R. 673, 682 (E.D. Va. 2003)).

The first factor—whether the matter is core or non-core—generally is afforded more weight than

the others.  *See, e.g.*, *Security Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997);

*In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993); *In re Coe-Truman Techs., Inc.*, 214

B.R. 183, 187 (N.D. Ill. 1997).  Although the presence of core proceedings strongly militates against

the withdrawal of the reference, it is not dispositive.  It is within the Court's discretion to withdraw

the reference even when core proceedings are involved.  *See United States v. Miller*, 5:02-cv-168-c,

2003 U.S. Dist. LEXIS 24884, at *15 (N.D. Tex. Dec. 22, 2003).

The distinction between core and non-core issues is not always clear, especially in cases

where state-law claims are precipitated by the financial dealings of a bankrupt debtor.  The statute

loosely defines core proceedings as matters "arising under" the bankruptcy code and provides a non-

exhaustive list of core proceedings.  28 U.S.C. § 157(b).  As a general rule, "a proceeding is core

. . . if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature,

could arise only in the context of a bankruptcy case." *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987).

Conversely, a proceeding related to a bankruptcy case may be considered non-core if four criteria

are satisfied:

> (1) the claims are [not] specifically identified as core proceedings under 28 U.S.C.
> § 157(b)(2); (2) the claims existed prior to the filing of the bankruptcy case; (3) the
> claims are based entirely on state law or otherwise existed independently from title
> 11; and (4) the parties' rights or obligations are [not] significantly affected by the
> outcome of the bankruptcy proceedings.

*Blackshire v. Litton Loan Servicing, L.P.*, 2:08-mc-116, 2009 U.S. Dist. LEXIS 17715, at *7 (S.D.

W. Va. Feb. 13, 2009) (Goodwin, C.J.) (citing *Caperton v. A.T. Massey Coal Co.*, 270 B.R. 654, 657

(Bankr. S.D. W. Va. 2001)).

>       *B.      Discussion*

In order to determine whether there is good cause to withdraw the reference, the Court begins

by categorizing this proceeding as core or non-core. Dwyer's claims are not among the list of core

proceedings found in § 157(b)(2). Accordingly, each must be assessed in light of the relevant

criteria for consideration as non-core matters related to the bankruptcy proceedings.

Dwyer's complaint in the removed civil action, which is mirrored in Count 2 of the amended

complaint in the AP, presents claims against FNB, Garten, and Henthorn for fraud, civil conspiracy,

aiding an abetting a wrongful act, tortious interference with contract, and negligence. None of these

claims arise from rights or obligations contained in the bankruptcy code, nor do they seek a recovery

from the debtor. Rather, each claim sounds in West Virginia tort law. The allegedly tortious acts

giving rise to Dwyer's tort claims occurred, and the causes of action accrued, prior to the filing of

O'Brien's bankruptcy petition. Furthermore, with the exception of Trustee Graham, all parties to

this action are creditors in the bankruptcy proceedings. Dwyer's right to recover tort damages from

FNB, Garten, and Henthorn is not impaired by their status as fellow creditors in the O'Brien

bankruptcy proceedings.  Dwyer's damages, if any, would be paid by one or more of the parties to

this action, not by the debtor or the bankruptcy estate.  Accordingly, the Court **FINDS** that Dwyer's

tort claims satisfy the criteria for being considered non-core proceedings related to the bankruptcy

proceedings.

Dwyer's other claim, found only in Count 1 of the amended complaint in the AP, seeks a

declaration that certain funds FNB seized from O'Brien's accounts were owned by Dwyer and the

impression of a constructive trust on those funds for Dwyer's benefit.  Included in this claim is the

assertion that Dwyer's right to the funds is superior to, and takes priority over, the claims of FNB

and the bankruptcy estate.  Thus, Dwyer's request for declaratory relief is largely characteristic of

the examples of core proceeding listed in § 157(b)(2).  Claims of this nature against fellow creditors

are not unambiguously designated as core proceedings, however, and the claim is amenable to

analysis under the criteria for non-core proceedings related to bankruptcy.

In order to determine whether Dwyer's Count 1 claim is a core or non-core matter, the Court

must look behind the complaint, to the nature of the rights implicated and to the relationship of the

claim to the ongoing bankruptcy proceedings.  As will become apparent, this undertaking raises

more questions than it answers.

Count 1 does not expressly identify the source of the substantive rights Dwyer seeks to

vindicate.  Instead, it sets forth a factual basis for seeking declaratory relief and a constructive trust

on funds held by FNB.  Declaratory judgment is a statutorily created remedy; it is not an

independent source of substantive rights.  *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States

. . . may declare the rights and other legal relations of any interested party seeking such

declaration."); *see also Coomes v. Adkinson*, 414 F. Supp. 975, 984 (D.S.D. 1976) ("The Declaratory

Judgment Act . . . does not create any new substantive right but rather creates a procedure for

adjudicating existing rights."). Likewise, "[a] constructive trust is an equitable remedy, not a cause

of action in and of itself." *Lyon v. Campbell*, 33 Fed. App'x 659, 663 (4th Cir. 2002) (unpublished).

Although the rights Dwyer asserts in Count 1 are not stated expressly, they may be inferred

from the complaint. Dwyer maintains that O'Brien had no equitable interest in the disputed funds

deposited into the FNB account. Dwyer further asserts that FNB had knowledge of this fact when

it seized the funds to setoff against debts O'Brien owed to FNB. For this reason, Dwyer seeks the

impression of a constructive trust on the funds. However, Dwyer does not specify whether the right

he seeks to protect with the constructive trust arises from state law or from the bankruptcy code.

The right could come from either source.

Under West Virginia law,

[a] constructive trust is substantially an appropriate remedy against unjust
enrichment. It is raised by equity in respect of property which has been acquired by
fraud, or where, although acquired originally without fraud, it is against equity that
it should be retained by the person holding it . . . . Any transaction may be the basis
for creating a constructive trust where for any reason the defendant holds funds
which in equity and good conscience should be possessed by the plaintiff.

*Timberlake v. Heflin*, 379 S.E.2d 149, 155 (W. Va. 1989). Dwyer's claim in Count 1 reasonably can

be construed as asserting a claim under West Virginia law for unjust enrichment. In this respect,

Count 1 would dovetail with the state law tort claims asserted in Count 2 as an alternate avenue for

recovery of the money paid to O'Brien. This cause of action would have accrued on a date prior to

the filing of the bankruptcy petition. Accordingly, construing Count 1 as a state law claim militates

in favor of a finding that it is a non-core proceeding. However, the fact that Dwyer asserted Count

1 in the AP, but not in the civil action filed in state court, suggests that the cause of action is not based on state law.

It is more likely, but not certain, that Dwyer's Count 1 claim arises from the bankruptcy code. Bankruptcy courts' power to dispose of assets for the benefit of a debtor's creditors is limited to those assets and interests possessed by the debtor at the time of the filing of the petition and those possessed by others which are swept into the bankruptcy estate by operation of the bankruptcy code. *See* 28 U.S.C. § 157. Specifically excluded from the bankruptcy estate is "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest." *Id*. § 157(d). "[W]hat constitutes an 'equitable interest' subject to exclusion from the bankruptcy estate under § 541(d) is a question of state law." *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 722 (4th Cir. 1998). Where the debtor holds mere legal title to property, it is appropriate for the court to impose a constructive trust on the property for the benefit of the third-party owner of the beneficial interest in the property. The availability of a constructive trust as a remedy likewise is a question of state law. *See In re Auto-Train Corp.*, 53 B.R. 990, 996 (D.D.C. 1985). Notwithstanding the borrowing of provisions of state law to define the nature of the third-party's rights to property held by the debtor, a suit to exclude property from the bankruptcy estate is properly considered a core proceeding arising under the bankruptcy code. *See Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 436 (5th Cir. 1994) ("[Section] 541(d) accords the beneficiary of a constructive trust, properly imposed under state law, the right to recover the trust property from the bankruptcy trustee or the debtor."); *cf.* 28 U.S.C § 157(b)(3) (providing that a proceeding may be core even though "its resolution may be affected by State law"). The Fourth Circuit made this point clear in *In re Johnson*, in which the court stated:

10

> [T]he only proper forum for determining whether assets held by a debtor are held in constructive trust is the bankruptcy court, and such proceedings must be considered core proceedings.   A determination of the proper beneficiaries of that trust is inextricably tied to the finding of a constructive trust. Distribution of the trust to the proper beneficiaries necessarily is predicated upon a determination of who those beneficiaries are.  The finding of a constructive trust by the bankruptcy court and a determination of the proper distribution of that trust are intimately tied to the traditional bankruptcy functions and estate, and, therefore, are core matters within the clear jurisdiction of the bankruptcy court.

*Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 402 (4th Cir. 1992).

As FNB highlights in its motion to withdraw the reference, this case does not present a typical case wherein a creditor seeks to impose a constructive trust on property held by the debtor. In this case, the property allegedly subject to a constructive trust for Dwyer's benefit is not held by the debtor; it was seized by FNB prior to the filing of the bankruptcy petition to setoff against debts O'Brien owed to the bank.  Accordingly, FNB argues that this case is factually distinguishable from *In re Johnson*.

FNB therefore urges the Court to follow the lead of the Seventh Circuit in *Whiting-Turner Contracting Co. v. Elec. Mach. Enters. (In re Elec. Mach. Enters.)*, 479 F.3d 791 (7th Cir. 2007). That case involved a dispute between a general contractor and a bankrupt subcontractor.  While the bankruptcy proceedings were pending, the general contractor collected a settlement from a third-party on behalf of itself and the subcontractor.  The general contractor refused to turn over any of the settlement funds to the subcontractor on the grounds that the subcontract agreement had been paid in full.  The bankruptcy court imposed a constructive trust on the proceeds of the settlement and, relying on *In re Johnson*, exercised jurisdiction over the res of the trust as a core proceeding. The Seventh Circuit reversed the bankruptcy court, holding that when the property subject to the constructive trust is held by a creditor, rather than the debtor, the proceeding is non-core.  *Id.* at 797.

*In re Electric Machinery Enterprises* is instructive, but like *In re Johnson*, it is not directly on point. In *In re Electric Machinery Enterprises*, the debtor sought to impose a constructive trust on property held by a creditor in a creative attempt to recover a disputed and unliquidated claim against the creditor. This situation is factually distinguishable from the present case in one important respect: There was no question in *In re Electric Machinery Enterprises* that the creditor came into possession of the disputed property by innocent means and not as a result of an attempt to circumvent the bankruptcy proceedings. The same cannot be said of the manner in which FNB came into possession of the funds at issue here. Dwyer's allegations call into question the propriety of FNB's setoff of the funds in O'Brien's accounts.[4]

The bankruptcy code defines setoff as the "right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under [title 11] against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a). For example, "if the debtor and the creditor each owed the other $20, they could set those debts off against each other, rather than attempting to collect from each other." *In re De Laurentiis Entm't Group, Inc.*, 963 F.2d 1269, 1274 (9th Cir. 1992). Like any debt, bank accounts[5]

---

[4]  *In re Kaiser*, 722 F.2d 1574 (2d Cir. 1983), is more closely analogous to the facts of this case than either of the cases cited by the parties here. In that case, the bankruptcy court imposed a constructive trust on real property held by the debtor's wife under circumstances in which the debtor and his wife participated in a scheme to defraud the debtor's creditors. The Second Circuit found the proceeding to be core.

[5]  It is said colloquially that a person "has X dollars in his bank account," but this is not an accurate depiction of the legal relationship between the bank and its customers. Deposit accounts do not consist of actual cash held by the bank for its depositors' benefit; rather, a person who deposits money in an account surrenders legal title to the funds to the bank in exchange for the right to demand payment from the bank. *See In re Figueira*, 163 B.R. 192, 194 (Bankr. D. Kan. 1993). Stated differently, a bank account balance represents a debt the bank owes to the depositor. *See*
(continued...)

are subject to the setoff provisions of state and federal law if the bank and the depositor owe mutual debts to each other.  *See* 11 U.S.C. § 553(a) (bankruptcy code); *S. Elec. Supply Co. v. Raleigh County Nat'l Bank*, 320 S.E.2d 515, 519 (W. Va. 1984) (noting that, in West Virginia, "[b]anks have a common law right to setoff").  Setoffs are subject to the automatic stay, 11 U.S.C. § 362(a)(7), and, therefore, are valid only if they occur prior to the petition or subsequent to relief from the stay.  Pre-petition setoffs, like the one at issue here, are rarely disturbed by the bankruptcy proceedings.  *See In re De Laurentiis Entm't Group, Inc.*, 963 F.2d at 1277.

Setoffs are not immune from the bankruptcy trustee's avoidance powers, however.  The trustee may avoid an improper setoff and return the property to the bankruptcy estate if (1) the setoff occurred less than ninety days before the filing of the bankruptcy petition; (2) the debtor was insolvent at the time of the setoff; and (3) the creditor incurred the debt to the insolvent debtor "for the purpose of obtaining a right of setoff."  11 U.S.C. § 553(a)(3); *see also Durham v. SMI Indus. Corp.*, 882 F.2d 881, 882 (4th Cir. 1989) (describing the procedure to avoid invalid setoffs as preferences).  Dwyer alleges that O'Brien, Garten, Henthorn, and FNB colluded to improve FNB's position as a creditor on the eve of O'Brien bankruptcy.  These allegations cast doubt on the validity of FNB's setoff.  Thus, it remains to be determined whether the disputed funds are properly in FNB's possession or whether they should be disgorged to the bankruptcy estate.

The proper forum to resolve questions as to the validity of FNB's setoff of a debt owed by O'Brien is in the bankruptcy court, as actions to avoid preferences and fraudulent transfers are

---

[5](...continued)
*Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor . . . ."); *accord U.S. Fid. & Guar. Co. v. Home Bank*, 88 S.E. 109, 111 (W. Va. 1916) (construing West Virginia law).

designated by statute as core proceedings.  28 U.S.C. § 157(b)(2)(F), (H).  If the setoff is invalid,

then the disputed funds should be returned to the bankruptcy estate and this case becomes factually

indistinguishable from *In re Johnson*.  Thus, Count 1 would be a core proceeding within the

bankruptcy court's jurisdiction.  Moreover, assuming the setoff is valid, it would be premature for

this Court to withdraw this matter from bankruptcy before the issue is settled in that forum.  In either

event, the decision to challenge the validity of the setoff lies with the bankruptcy trustee.  It would

be imprudent for the Court to predict what actions the trustee may take or to limit the options that

may be available to him.[6]  Accordingly, the Court declines to make a finding as to whether Dwyer's

Count 1 is a core or non-core proceeding on the record as it now stands.  The bankruptcy court is

competent to make such a finding at the appropriate time.  28 U.S.C. § 157(b)(3).[7]

Having determined that it is premature to categorize Count 1 as core or non-core, the other

factors concerning cause to withdraw the reference fall into place.  Permitting the bankruptcy court

to resolve the outstanding bankruptcy law questions in this proceeding promotes the uniformity of

bankruptcy law.  Whether this matter proceeds in the district court or the bankruptcy court for the

time being will have no significant effect on judicial economy or the efficient use of the parties'

---

[6]  In a similar vein, Dwyer's allegations suggest that the cattle O'Brien delivered to Garten may be
an avoidable fraudulent conveyance notwithstanding that Garten paid value for the cattle.  *Cf.* 11
U.S.C. § 548(a)(1)(A) (providing that transfers made with actual intent to defraud debtor's creditors
are avoidable).

[7]  Subsection 157(b)(3) provides:

> The bankruptcy judge shall determine, on the judge's own motion or on timely
> motion of a party, whether a proceeding is a core proceeding under this subsection
> or is a proceeding that is otherwise related to a case under title 11.  A determination
> that a proceeding is not a core proceeding shall not be made solely on the basis that
> its resolution may be affected by State law

resources.  There is no indication that any interested parties here are engaged in forum shopping.

Lastly, declining to withdraw the reference at this time preserves the right to a jury trial because the

reference may be withdrawn if and when a jury trial becomes necessary.  Accordingly, the motion

for withdrawal of reference to the bankruptcy court [Docket 1 in 5:08-mc-58] is **DENIED**.

### III.  MOTION TO CONSOLIDATE ACTIONS

For the reasons discussed above, the bankruptcy court is the appropriate forum to address

the issues raised in Dwyer's complaints—at least until such time as the bankruptcy court resolves

all core proceedings and only non-core issues remain, or until a jury trial becomes necessary.[8]  *Cf.*

*In re Nady*, 138 B.R. 608, 609–10 (D. Nev. 1992).  Pursuant to 28 U.S.C. § 157(a) and Rule 83.13

of the Local Rules of Civil Procedure, Civil Action No. 5:08-1269 is referred to the bankruptcy

court.

The one-count complaint in Civil Action No. 5:08-1269 is identical to Count 2 of the

amended complaint in the Miscellaneous Case No. 5:08-58.  Therefore, consolidation of the two

proceedings in the bankruptcy court is appropriate.  *See* Fed. R. Civ. P. 42(a).  The unopposed

motions to consolidate the proceedings [Docket 6 in 5:08-mc-58; Docket 7 in 5:08-cv-1269] are

**GRANTED**.  Civil Action No. 5:08-1269 is hereby designated as the lead action.

### IV.  CONCLUSION

For the reasons stated above, Defendant/Appellee First National Bank's Motion for

Withdrawal of Reference to the Bankruptcy Court [Docket 1 in 5:08-mc-58] is **DENIED**.

Plaintiff/Appellant Robert Dwyer's Motions to Consolidate Civil Actions [Docket 6 in 5:08-mc-58;

---

[8]  The Court expresses no opinion at this time as to the merits of Garten's argument that FNB has
waived its right to a jury trial.

Docket 7 in 5:08-cv-1269] are **GRANTED**.  Civil Action No. 5:08-1269 is **REFERRED** to the bankruptcy court and consolidated with Miscellaneous Case No. 5:08-58, the former case being designated as the lead action.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record, any unrepresented party, and the United States Bankruptcy Court for the Southern District of West Virginia.

ENTER:        May 19, 2009

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE